UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERCIA EX                     CIVIL ACTION
REL. ROBERT DANIEL MARCY

VERSUS                                          NO. 03-3395

ROWAN COMPANIES, INC., ET AL                    SECTION: "A"(3)

## ORDER

Before the Court are Motions to Dismiss, filed by Defendant Remington Oil and Gas

Corporation (Rec. Doc. 9), Defendant Rowan Companies, Inc. (Rec. Doc. 12), and Defendants

Newfield Exploration Gulf Coast, Inc. and Newfield Exploration Company (Rec. Doc. 14).

Plaintiff/Relator Robert Daniel Marcy opposes the motions.  The motions, set with a hearing date

of  March 22, 2006, are before the Court on the briefs without oral argument.  For the reasons

that follow, the motions are **GRANTED**.

## I.  BACKGROUND

Plaintiff/Relator Robert Daniel Marcy filed this *qui tam* action on behalf of the United

States on December 2, 2003 under the False Claims Act, 31 U.S.C.A. § 3729 *et seq.*  Marcy

alleges that Defendant Newfield Exploration Gulf Coast, Inc. ("Newfield Gulf Coast"), formerly

known as EEX Corporation, is the lessee of mineral rights under an oil and gas lease granted by

the United States of America under the Outer Continental Shelf Lands Act ("OCSLA").  (See

Original Complaint, ¶¶ 6, 9).  He contends that Defendant Newfield Exploration Company

("Newfield") is an independent oil and gas company engaged in the exploration, development,

and acquisition of oil and natural gas properties.  (*Id.*, ¶ 11).  Marcy further alleges that

Defendant Rowan Companies, Inc. ("Rowan") is a provider of oil drilling services, and provided

those services as a contractor to Newfield Gulf Coast and Newfield pursuant to Newfield Gulf

Coast's lease with the United States.  (*Id.*, ¶ 7).  Marcy contends that during all relevant times,

Rowan owned and/or operated in excess of (20) off-shore oil rigs in the Gulf of Mexico,

including the Midland offshore oil exploration and drilling rig ("the Midland"), upon which

Marcy worked as an employee of Rowan.  (*Id.*, ¶ 26).  He contends that while working on the

Midland, he witnessed and was required to participate in the illegal nighttime dumping of oil, oil

waste, grease, trash, and other hazardous and solid waste from the Midland into the Gulf.  Marcy

claims that Defendant Remington, during all relevant times, operated the Midland.  (*Id.* ¶ 25).

Marcy believes that the alleged dumping activities of Defendants that he witnessed are also

practiced on all other rigs operated and/or owned by Defendants Rowan and Remington, and

over other leaseholds on which these defendants operate.  (Pla. First Amended Comp., ¶ 49).

Marcy seeks damages for Defendants' alleged fraudulent concealment of violations of the

Federal Water Pollution Control Act (a.k.a. "Clean Water Act"), 31 U.S.C. § 3729 *et seq.*,

violations of the Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C.A. 1901, *et

seq.*,intentional failure to report discharges of oil and/or hazardous substances into the navigable

waters of the United States as required by the FWPCA and APPS, intentional omission of a

record of the discharges of oil and hazardous substances from the oil rigs "Oil Record Book" as

required by 33 C.F.R. § 151.25, intentional omission of a record of discharges of oil and hazardous substances from Mineral Management Service ("MMS") Form 133 filed weekly by Defendants pursuant to Department of the Interior regulations, fraudulent avoidance of civil fines and penalties under the FWCPA and the APPS, fraudulent avoidance of remediation obligations under the Oil Pollution Act of 1990 ("OPA") 33 U.S.C.A. § 2701 *et seq*., violations of the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 *et. seq.* ("OCSLA"), fraudulent avoidance of civil fines and penalties under the OCSLA, fraudulent concealment of Defendants' material breach of the terms of the Lease, and fraudulent retention of oil and gas, oil and gas royalties, and profits owed the United States of America.  (*Id.*, ¶ 2).

Marcy contends that this alleged fraudulent conduct constitutes violations of paragraphs (2) and (7) of Section 3729(a) of the False Claims Act ("FCA"), which provide in pertinent part: "Any person who (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; . . . [or] (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government. . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person. . . ."  False Claims Act, 31 U.S.C.A. § 3729; (*Id.*, ¶¶ 4-5, 52, 61).

After investigating Marcy's allegations, the United States filed a "Notice of Election to Decline Intervention" on August 12, 2005, reserving its right to intervene for good cause at a later date.  It has not done so up to this point.

Defendants have each filed a Motion to Dismiss, contending that Marcy has failed to state a claim under the False Claims Act and that he has not alleged fraud with the particularity required by Fed. R. Civ. p. 90(b).  Defendant Rowan has filed a Memorandum in Support of its Motion to Dismiss, which has been adopted by Defendants Remington, Newfield Gulf Coast and Newfield.

## II.  <u>DISCUSSION</u>

### A.  *The Parties' Arguments*

Defendants argue that Marcy's allegations lack the threshold elements of an FCA claim, and his theory of liability has been expressly rejected by the Fifth Circuit and other courts.  They argue that he has failed to allege that any Defendant ever submitted any claim for payment to the United States; that any Defendant ever received any monies from the United States, that any defendant ever made any statement, false or otherwise to the United States; or that any Defendant had any payment obligation to the United States that was avoided, reduced or decreased by the use of any false record or statement.  Thus, Defendants contend that Marcy has failed to state a claim under the FCA, and his suit should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).  In the alternative, Defendants allege that the Complaint does not allege fraud with the particularity required by Fed. R. Civ. P. 9(b).

Marcy opposes, arguing that Congress intended that the FCA be given a broad reach that includes wrongfully misrepresenting compliance with the obligations of a government contract and reverse false claims to avoid payment of fines.  He contends that the lease at issue requires the lessee to maintain operations in compliance with the OCSLA and with regulations and orders

intended to protect persons, property, and the environment on the Outer Continental Shelf.  He further contends that the Secretary may cancel the lease under the OCSLA and the terms of the lease for violation of the obligations under the lease, § 1334 of the OCSLA, or for causing "serious" harm or damage to the marine environment.

Marcy also alleges that the lease entitles Federal inspectors to "prompt access" to the rig for inspections and further requires the lessees to provide "any documents and records which are pertinent to occupational or public health, safety, or environmental protection as may be requested."  (Pla. Opp., p. 6 (quoting Exh. B., Lease)).  He further alleges that the Midland, per the lease terms and federal regulations, is required to maintain an Oil Log Book and to file the weekly MMS 133 form with the Miner Management Service ("MMS").  Marcy claims that the alleged dumping of oil and other hazardous waste was required to be documented in those records.  Specifically, he contends that Defendants are required to note in the Midland's Oil Log book any "discharges of oil or oily mixture into the navigable waters of the United States."  (*Id.* (quoting 33 C.F.R. § 151.25(g)).  He contends that the Coast Guard has the authority to inspect the Midland to determine if any spillage of oil has occurred and may review the Oil Log book as part of that inspection.  *Id.* (quoting 33 C.F.R. § 151.23(c)).

Marcy argues that Defendants intentionally failed to report the spills and dumping as required by the CWA, the APPS, and the OPA and, with the intent to defraud the United States and conceal their violations of the law and breach of the lease, omitted records of the spills from the Midland's Oil Log Book and the MMS 133 reports filed with the MMS.  Further, he contends that Defendants have falsely and with the intent to defraud the United States certified

compliance with the terms of the lease in order to continue to harvest the property of the United States, namely oil and gas resources, absent the authority to do so.

Marcy contends that he has sufficiently stated a claim under § 3729(a)(2) of the FCA, which requires that Defendants "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." He contends that Defendants erroneously focus their argument on the lack of a "claim" for payment in the form of a false invoice or the like.  He argues that while this is the most common form of an FCA violation, it is not the only form of an actionable false "claim" under the FCA. He contends that a false claim under the FCA, as amended in 1986, encompasses more than submitting a request for payment for goods and/or services not actually provided.

Marcy claims that an oil and gas or other Federal mineral lease is a unique form of Government contract.  He distinguishes such a lease from a typical procurement contract under which the contractor supplies a good or service to the Government and then submits an invoice or claim for payment.  He explains that a mineral lease is in essence permission for the lessee to harvest the property of the United States subject to the terms and conditions of the lease.  Marcy alleges that each act of taking oil and gas belonging to the United States is a "claim" within the expansive meaning of the FCA.  He contends that the lessee is required to submit to the Government on a weekly basis the MMS 133 form which documents the lessee's performance under and compliance with the terms of the lease.  According to Marcy, these forms certify to the Government through the MMS compliance with the terms and conditions of the lease.  He contends that the difference between this case and most cases is that here, Defendants are falsely

6

certifying compliance with the lease in order to maintain the right to take the property of the United States while in a typical case the false certification prompts the Government to give the contractor the funds or property of the United States.  He argues that in both circumstances, a violation of the FCA has occurred.

He contends that cases have interpreted actionable "claims" to include situations in which defendants falsely, either implicitly or expressly, certify to the Government compliance with the terms of a contract with the Government in order to receive or retain the benefits under the contract, namely funds or property of the United States.  Marcy argues that by falsely certifying compliance with the clear terms of the lease requiring compliance with all applicable environmental laws and regulations, the Defendants induced the government to transfer United States' property to them by continuing to allow them to harvest the oil and gas resources of the United States.  He argues that the Fifth Circuit in *United States ex rel. Weinberger v. Equifax, Inc.*, 557 F.2d 456, 460-61 (5th Cir. 1977) recognized that someone can be liable under the FCA for "material misrepresentations made to qualify for government privileges or services."  He contends that the FCA as amended in 1986 clearly encompasses more than claims for payment of money, but also includes the transfer or retention of any property of the United States which would include its oil and gas reserves.

Marcy argues that Defendants' statement that he has not alleged that any claim was made to the government is incorrect and ignores the substantial history of courts permitting false certification claims.  He claims that a "claim" was made by Defendants each time that natural resources were extracted from federal land on the Outer Continental Shelf.  He further contends

7

that the Defendants did so under the impression of a matter of right.  He argues that by doing so, Defendants have impliedly certified that they are entitled to the resources; *i.e.* that they have complied with the terms of the lease.  He contends that such certification was clearly false and therefore establishes a false claim within the meaning of the FCA.

Marcy next alleges that he has stated a claim under Section 3729(a)(7), which requires that Defendants "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government."  Marcy contends that his allegations are sufficient.  He claims that Defendants falsified the Midland's Oil Log Book and the MMS 133s in order to conceal their repeated violations of numerous environmental statutes for the purpose of avoiding the applicable civil fines proscribed by those statutes and their strict liability for clean-up costs and damages under the Oil Pollution Acts.  He contends it cannot be disputed that the Oil Log Book and the MMS 133 forms, both required to be maintained by federal regulation for the purpose of providing data and information to the government to assure compliance with federal law and the lease terms, are records which are submitted to the government and/or subject to federal inspection.  He argues that when material information is omitted from those records, they are "false records" as that term is defined by § 3729(a)(7).

Marcy contends that Defendants' argument that he has failed to state a claim because the obligation of paying civil fines and penalties and the remediation obligations are contingent or speculative and therefore do not constitute an obligation owed the government is contrary to substantial case law.  He argues that the alleged discharges in this case were in direct violation of

the CWA, which establishes civil fines and penalties for illegal dumping.  Marcy further alleges that Defendants had an obligation to notify the government of the unlawful discharges because the CWA provides that "any person in charge of a vessel or of an onshore facility or an offshore facility *shall*, as soon as he has knowledge of any discharge or oil or a hazardous substance from such a vessel or facility in violation of paragraph (3) of this subsection, *immediately* notify the appropriate agency of the United States Government of such discharge."  33 U.S.C.A. § 1321(b)(5)(emphasis added).  He claims that the words "shall" and "immediately" establish an obligation that attached at the time of the violation and not at some later date.[1]  He contends that Defendants avoided this obligation by falsifying their Oil Log book and MMS 133 forms.

Marcy next contends that the OCSLA at 43 U.S.C.A. § 1337 allows the Secretary of the Interior to "reduce or eliminate" any royalty owed the United States for the benefit of the lessee. He alleges that relief from the Defendants' obligation to pay is conditioned upon continued compliance with the terms of the lease, which includes the requirement to abide by all applicable environmental regulations.  He argues that in violating the terms of the lease and thereby continuing to pump oil from the Outer Continental Shelf when in breach of the lease, the Defendants are obliged to transfer to the United States any oil and gas taken from the United States without the authority to do so, and to pay any oil and gas royalty owed the United States. He contends that by falsifying the Midland's Oil Log Book and MMS 133 forms, the Defendants submitted false records for the purpose of avoiding those obligations to transfer property and/or

---

[1]  Marcy alleges that the APPS at 33 U.S.C.A. § 1906 contains a similar self-reporting requirement and civil fine provisions.

pay oil and gas royalties in violation of Section 3729(a)(7) of the FCA.

Finally, Marcy contends that he has alleged fraud with sufficient particularity, but nonetheless, he has filed an Amended Complaint, which is more detailed than the original, so that Defendants will abandon their argument regarding insufficiency of the fraud allegations. Marcy also requests that it be allowed to file a second amended complaint should the Court find that the first is inadequate.

Defendant Rowan has filed a reply memorandum in support of its motion to dismiss. Rowan continues to assert that Marcy has failed to allege the existence of a "claim" or that any Defendant submitted a false record or statement to the United States to get a false claim paid, as required under Section 3729(a)(2). Rowan contends that Marcy has ignored that the FCA strictly defines a "claim" as a "request or demand, whether under a contract or otherwise, for money or property." (Def. Reply, p. 4 (quoting 31 U.S.C. § 3729(c)). It contends that Marcy does not allege in his original complaint or first amended complaint that any Defendant ever made any request or demand for money or property upon the United States, or that any Defendant ever made any attempt to cause the Government to pay out sums of money. It argues that Marcy's contention that each act of taking oil and gas belonging to the United States is in essence a "claim" is without merit because the physical extraction of natural resources is not a request or demand for money or property.

Rowan further argues that the cases cited by Plaintiff involved a payment of money by the United States to the defendants. It contends that this is the critical element missing from Marcy's allegations, and no amount of additional pleading could cure this defect. Rowan also

argues that Marcy misstates the holdings of several key cases.

Additionally, Rowan argues that Marcy has failed to allege that any Defendant submitted a false record or statement to the United States to get a false claim paid.  It contends that the allegedly inaccurate Oil Record Logs and MMS 133 reports cannot be the basis for a claim under this section.  It argues that Marcy does not allege that the Oil Log reports were ever submitted to the United States.  As for the MMS 133 reports, Rowan contends that no part of this document contains any certification of compliance with the terms of the lease, much less compliance with any federal statute or regulation.  Further, it contends that the document does not even have a section where discharges of oil or other substances are required to be reported, and thus Marcy's contention that Defendants certified compliance in such a document cannot succeed.

Rowan further contends that even if an MMS 133 report did contain a certification, and Marcy had properly alleged that such certification was false, his claim would still fail because he has not alleged that certification on the MMS 133 form was a prerequisite or condition of payment for any monies from the government, which requirement it contends has been clearly established by the Fifth Circuit.

Next, Rowan argues that Marcy's argument is premised on the erroneous assumption that the United States would have automatically cancelled the lease had it known of the alleged environmental violations.  It contends that Marcy has ignored that Section 13 of the Lease – Suspension and Cancellation – is discretionary.  It argues that Marcy does not, and cannot allege, that the United States automatically would have cancelled the lease had it known of the alleged environmental violations.  It further argues that even if the lease has been cancelled, this only

11

would have had the effect of eliminating royalties paid by Defendants to the United States. It thus contends that under no set of circumstances can Marcy prove that any alleged "false certification" was used to get a false claim paid.

Rowan also continues to urge the Court to dismiss Plaintiff's claim under Section 3729(a)(7). It contends that a legal obligation to pay the United States a civil or criminal fine under any statute, including the CWA and APPS, does not accrue as of the date of the alleged violation, but rather, it accrues only after a government prosecutor decides to initiate a case, after such case is presented to a jury, and after a jury finds beyond a reasonable doubt that there in fact was violation of the statute in question. It contends that none of these things have happened in this case, and thus Marcy's claim must fail. Rowan further contends that the two primary district court decisions relied upon by Marcy to support its position have been overruled.

Marcy has filed a response to Rowan's Reply brief. His arguments address his claim under Section 3729(a)(2). He relies on his original memorandum of law in opposition to Defendants' motion to dismiss to respond to all additional arguments raised by Rowan in its reply. He contends that the reply focuses on the irrelevant fact that the Government was not induced to "pay out sums of money" but instead was induced to allow the taking of its property. He contends that the FCA clearly contemplates the payment of property in addition to money as giving rise to a claim. He argues that whether the Government takes some affirmative action to transfer the money or property, or as in this case, permits the Defendants to take their property, amounts to mere semantics. He contends that it is the act of using fraud to obtain a government benefit that gives rise to an FCA claim, and the way in which it is transferred is not material. He

12

argues that Defendants claim a right of possession and ownership of the oil and gas resources of the United States as authorized by the lease each and every time they harvest oil and gas.  He contends that Defendants' entire argument is based on the premise that the word "claim" within the meaning of the FCA is a "request" to the government.  He argues that to limit the meaning of "claim" in that way, and thereby the applicability of the FCA, would frustrate the purpose and intent of the Act.

Marcy further contends that Rowan's assertion that he has failed to allege that Defendants submitted a false record is completely baseless.  He reiterates that Defendants, as the owners and/or operators of an offshore oil rig, are required by federal statute and/or regulations to maintain an "Oil Log Book" and to submit weekly drilling reports, MMS Form 133's, to the MMS, a division of the Department of Interior.  He contends that the discharges of oil, trash, and hazardous substances into the Gulf of Mexico should be recorded in both of these records.  He contends that when these discharges are intentionally omitted, those records are false.  He further contends that, contrary to the Defendants' assertion, the false record need not contain an affirmative certification of contract compliance to give rise to a false certification Section 3729(a)(2) claim.  He asserts that the mere presentation of the reports to the Government with all information related to the material breaches of the lease terms intentionally omitted constitutes false certification of compliance with the lease terms.

*B. Law and Analysis*

In considering a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court must accept all well-pleaded facts as true and view the facts in the light most favorable to

the plaintiff.  *See Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996); *American Waste & Pollution Control Co. v. Browning-Ferris, Inc.*, 949 F.2d 1384, 1386 (5th Cir. 1991).  The Court must resolve doubts as to the sufficiency of the claim in the plaintiff's favor.  *Vulcan Materials Company v. City of Tehuacana*, 238 F.3d 382, 387 (5th Cir. 2001).  However, "conclusory allegations" and "unwarranted deductions of fact" are not sufficient to prevent dismissal.  *United States ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 379 (5th Cir. 2003).  Dismissal is warranted if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief.  *Id.*; *Piotrowski v. City of Houston*, 51 F.3d 512, 514 (5th Cir. 1995) (quoting *Leffal v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 524 (5th Cir. 1994)).

Marcy has alleged only two counts in his original and first amended complaints - one under Section 3729(a)(2) of the False Claims Act, and one under Section 3729(a)(7).  "The False Claims Act is the primary law on which the federal government relies to recover losses caused by fraud."  *McNutt ex rel. United States v. Haleyville Medical Supplies, Inc.*, 423 F.3d 1256 (11th Cir. 2005).  The Act provides in pertinent part:  "Any person who (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; . . . [or] (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person. . . ."  False Claims Act, 31 U.S.C.A. §

14

3729; (*Id.*, ¶¶ 4-5).  Liability under the FCA is not limited to those who have directly contracted

with the government.  *United States ex rel. Riley v. St. Luke's Episcopal Hospital*, 355 F.3d 370,

378 (5th Cir. 2004).  Rather, the FCA "applies to anyone who 'knowingly assist[s] in causing' the

government to pay claims grounded in fraud."  *Id.* (quoting *Peterson v. Weinberger*, 508 F.2d 45,

52-53 (5th Cir. 1975)).

    1. <u>Count I - Section 3729(a)(2)</u>

A plaintiff may recover under Section 3729(a)(2) against any person who "knowingly

makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent

claim paid or approved by the Government."  Marcy bases his Section 3729(a)(2) complaint on

allegations that Defendants knowingly and intentionally concealed their continued material

breach of the lease in order to continue to harvest oil resources of the United States and retain oil

and gas belonging to the United States and profits received from the sale of the oil resources

acquired.  (Pla. First Amended Comp., ¶ 52).  He contends that by intentionally omitting the

discharges from their weekly drilling reports and Oil Log Book, Defendants have fraudulently

asserted and certified that they are in compliance with the terms of the lease.  (*Id.*).  He alleges

that the submission of inaccurate and incomplete drilling reports, the false certification of

compliance with the terms of the lease, and the fraudulent retention of oil resources, profits from

the sale of oil resources, and retention of oil royalties, despite knowing violations of the

Defendants' lease constitute the presentation of a false claim for payment as defined by 31

U.S.C. § 3729(c) in violation of 31 U.S.C. § 3729(a)(2).  (*Id.*).  He further alleges that

Defendants' unlawful conduct is continuing in nature and threatens to deprive the United States

15

of its legal entitlement to a full share of oil royalties as well as its right to control and utilize the oil resources of the United States.  (*Id.*, ¶ 53).

Marcy argues that each act of taking oil and gas belonging to the United States is in essence a "claim" within the expansive meaning of the FCA.  (Pla. Opp., p. 8).  Marcy contends that the claim was false because at all relevant times the lessee was in fact in breach and default of the lease.  (*Id.*, p. 15).  He argues that in each instance where Defendants extracted natural resources, they did so under the impression of a matter of right.  (*Id.*).  He contends that by doing so, they have *impliedly* certified that they are entitled to the resources; *i.e.* that they have complied with the terms of the lease.  (*Id.*).

The Fifth Circuit "has recognized that 'services rendered in violation of a statute do not necessarily constitute false or fraudulent claims under the FCA.'"  *Willard v. Humana Health Plan of Texas, Inc*., 336 F.3d 375, 381 (5th Cir. 2003) (quoting *Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997)).  However, it "has also recognized that the FCA 'interdicts material misrepresentations made to qualify for government privileges or services.'"  *Id.*  While the Fifth Circuit has decided cases dealing with FCA liability based on express certifications of compliance with various statutes and regulations, it has not yet adopted an implied theory of certification.  *Id*., United *States ex rel. Stebner v. Stewart & Stephenson Services, Inc.*, 144 Fed. Appx. 389, 394 (5th Cir. 2005).  Assuming, *arguendo*, that the Fifth Circuit would recognize such a theory, it is clear, that to survive Defendants' motion to dismiss, Marcy must allege facts that would show that the Government "conditioned its payment" to the Defendants on their certification of compliance with the statutes or regulations at issue.  *Willard*,

336 F.3d at 382.  *See also Thompson v. Columbia/HCA Healthcare Corporation*, 125 F.3d 899,

902 (5th Cir. 1997) (holding that "where the government has conditioned payment of a claim

upon a claimant's certification of compliance with . . . a statute or regulation, a claimant submits

a false or fraudulent claim when he or she falsely certifies compliance with that statute or

regulation.").  Thus, he must allege facts that would show that the Government conditioned its

decision to allow Defendants to continue to use the leased property and benefit from its

resources on Defendants' certification of compliance.

Marcy cites *Shaw v. AAA Engineering & Drafting, Inc.*, 213 F.3d 519 (10th Cir. 2000) in

support of his position.  In that case, the defendant had contracted to perform photography

services for the Government.  *Id.* at 523.  Under the contract, the Defendant was required to

dispose of certain chemicals used in the film processing in accordance with environmental

guidelines and standards.  *Id.* at 527.  The Defendants argued that an invoice, submitted after the

violation of a contractual provision, could not constitute the knowing presentation of "a false or

fraudulent claim for payment or approval" under Section 3729(a)(1) of the FCA.  The 10th

Circuit found that "[p]ermitting FCA liability based on a false certification of compliance,

whether the certification is express or implied, is consistent with the legislative history of the

1986 Amendments to the FCA. . . .  The Senate Committee on the Judiciary noted a false claim

under the FCA 'may take many forms, the most common being a claim for goods or services not

provided, *or provided in violation of contract terms, specification, statute, or regulation*.'"  *Id.* at

531 (quoting S. Rep. No. 99-345 at 9, *reprinted in* 1986 U.S.C.C.A.N. at 5274).[2]

In further support of his position, Marcy cites *United States v. TDC Management* Corp., 24 F.3d 292 (D.C. Cir. 1994), in which the D.C. Circuit found that a Government contractor may be liable under the FCA if it knowingly omitted material information from monthly progress reports or it recklessly disregarded or deliberately ignored that possibility. *Id.* at 298. Marcy also cites *Ab-Tech Construction v. United States*, 31 Fed.Cl. 429 (1994). In that case, the Federal Claims Court found that progress payment vouchers submitted to the Government by a company awarded a contract for construction of a government facility pursuant to the Small Business Administration's ("SBA's") Program for minority-owned businesses were "false claims" under the FCA. *Id.* at 433-34. The court found that "[t]he payment vouchers represented an implied certification . . . of . . . continuing adherence to the requirements for participation in the . . . program." *Id.* It explained that "by deliberately withholding from SBA knowledge of the prohibited contract arrangement . . ., Ab-Tech not only dishonored the terms of its agreement with that agency, but more importantly, caused the Government to pay out funds in the mistaken belief that it was furthering the aims of the 8(a) program." *Id.* at 434.

Further, Marcy compares the instant case to *United States ex rel. Holder v. Special Device, Inc.*, 296 F. Supp. 2d 1167 (C.D. Cal. 2003). In that case, the plaintiff alleged that the defendant filed false claims in connection with a series of government contracts by failing to adhere to contractual obligations that required the defendant to follow environmental and health

---

[2] Notably, the court made this comment in addressing the plaintiff's claim under Section 3729(a)(1) of the FCA. Marcy has not made any allegations under this subsection. Rather, his claims are under (a)(2) and (7).

and safety regulations.  *Id.* at 1169.  The court noted that the contract at issue expressly stated that the defendant was required to comply with all applicable federal, state, and local laws, as well as certain federal regulations.  *Id.* at 1175.  It found that because the contract specifically required compliance, it was the *sine qua non* of payment by the government, and that the defendant could be liable under the FCA for failure to comply with federal regulations, whether or not affirmative certification of compliance was required.  *Id.* at 1175-76.

Marcy also compares the instant case to *Fallon v. Accudyne Corporation*, 880 F. Supp. 636 (W.D. Wis. 1995), in which the Western District of Wisconsin held that the plaintiff's allegations that the defendant was contractually bound to comply with environmental regulations, that the defendant knowingly failed to comply with those regulations, and that if falsely certified that it had so complied in order to induce payments from the Government under certain contracts was sufficient to state an FCA claim.  *Id.* at 638.  Further, Marcy notes that the Ninth Circuit in *Hopper v. Anton*, 91 F.3d 1261 (9th Cir. 1996) relied on the *Fallon* case when it found that "[v]iolations of laws, rules, or regulations alone do not create a cause of action under the FCA.  It is the false *certification* of compliance which creates liability when certification is a prerequisite to obtaining a government benefit."  *Id.* (citing *Fallon*, 880 F. Supp. at 638).[3]

---

[3] Defendants argue that none of the cases cited by Marcy support Marcy's argument that the physical extraction of oil and gas from federal lands constitutes a "claim" under the FCA, but rather confirm that a "claim" under the FCA is a request or demand for money or property from the United States.  They point out that the majority of cases cited by Marcy are distinguishable from this case because they involved situations in which the defendant sought a payment of money from the Government.  As previously noted, Marcy argues that the FCA contemplates the payment of property in addition to money as giving rise to a claim.  He contends that whether the government takes some affirmative action to transfer the money or property or, in this case, permits the Defendants to take their property, amounts to mere semantics.  He argues that it is

The court notes that a district court within this circuit has addressed a case in which the plaintiff made claims similar to Marcy's.  In *United States ex rel. Coppock v. Northrup Grumman Corporation*, 2003 WL 21730668 (N.D. Tex. 2003), the defendant leased a Naval Weapons Industrial Reserve Plant ("NWIRP"), a multi-acre industrial production and waste treatment complex, from the United States Department of the Navy, using the complex primarily for the production of military aircraft for the United States Department of Defense.  *See United States ex rel. Steven G. Coppock v. Northrup Grumman Corporation*, 2002 WL 1796979, at *1 (N.D. Tex. 2002) (*Coppcck I*).  The plaintiff alleged, *inter alia*, that the defendant had made false statements in Toxic Release Inventory Reports ("TRI Reports") that it was required under federal environmental laws to submit annually to the EPA in order to operate the NWIRP and the industrial waste treatment facility ("IWT Plant").  *Coppock*, 2003 WL 21730668, at *2.  The plaintiff further alleged that the defendant made "false implied certifications in rent payments to the Navy for use of the NWIRP property, in that it knew about its own malfeasance . . . and knew at the time it made rent payment that it was not substantially performing the material obligations of its contracts and thus had not satisfied the Navy's duty to continue providing the property to [the defendant]."  *Id.*  He argued that the claims were material because if the Navy knew that the defendant was violating the leases in this manner, it would not have allowed continued use of the property.  *Id.*

---

the act of using fraud "to obtain a government benefit" that gives rise to an FCA claim.  (Pla. Reply, p. 3 (quoting *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39, 51 (D. Mass. 2001)).

The court found that although the plaintiff alleged that compliance with environmental statutes and regulations and with maintenance requirements was expressly required by contract, and that he further asserted that compliance was a condition precedent to the Navy's duty to continue providing the rented property, he did not allege that "compliance with these contract terms was a true prerequisite to acceptance of rent payments and continued use of the NWIRP complex." *Id.* at *12. The court noted that plaintiff did not "allege that failure to certify statutory or contractual compliance would *necessarily* have resulted in termination of the leases." *Id.* It thus found that the counts in plaintiff's complaint in which he alleged that the defendant made a false claim by certifying, expressly or impliedly, compliance with environmental statutes and regulations and with contractual maintenance provisions in return for use of the NWIRP should be dismissed for failure to state a claim. *Id.* at *13.[4] The court noted

_____

[4] The court cited *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, (5th Cir. 2003) and *United States ex rel. Willard v. Humana Health Plan of Texas, Inc.* 336 F.3d 375 (5th Cir. 2003) in support of its holding.

In *Southland*, the defendants entered an agreement with the U.S. Department of Housing and Urban Development ("HUD"), by which HUD promised to guarantee the defendants' ("the Owners'") obligation under a mortgage used to purchase an abandoned apartment complex and also to subsidize tenants' rent payments in accordance with a subsequently-executed housing assistance payment contract ("HAP contract"). *Southland*, 326 F.3d at 672. In turn, the Owners agreed to substantially rehabilitate the property and to keep it "in good repair and condition." *Id.* In the HAP contract, the Owners agreed to "maintain the [property] . . . to provide Decent, Safe, and Sanitary housing." *Id.* Additionally, the contract called for the Owners to make monthly requests for housing assistance payments by submitting a HAP voucher. *Id.* On the HAP vouchers, the Owners were "required to give the details of occupied apartments and the supplemental rental payments due, and certify that 'to the best of [their] knowledge and belief (i) the dwelling units [we]re in Decent, Safe, and Sanitary condition, [and] (ii) all other facts and dates on which the request for funds [were] based [were] true and correct. . . .'" *Id.* The United States filed suit against the Owners under the False Claims Act, contending that the 19 HAP vouchers submitted between July 1995 and January 1997 falsely certified that the property was decent, safe, and sanitary. *Id.* at 674. The United States contended that each certification

constituted a false statement and/or record under Section 3729(a)(2).  *Id.*  It alleged that the certifications had been used to secure $865,023 in housing subsidies.  *Id.*

The Fifth Circuit found that although Section 3729(a)(2) "prohibits the submission of a false record or statement, it does so only when the submission of the record or statement [i]s done in an attempt to get a false claim paid."  *Id.* at 675.  Applying this law to the HAP contract and the course of conduct between HUD and the Owners, it concluded that "the Owners were entitled to the housing payments sought, and, thus, they made no false claims."  *Id.*  The court found that the United States' position that claims for housing assistance payments were false claims for payments to which the Owners were not entitled ignored the fact that the HAP contract explicitly addressed a breach such as the one alleged by the United States and provided a specific remedy:  "when the Owners are notified by HUD that they have failed to maintain the property in decent, safe, and sanitary condition and that corrective action must be taken within the time specified in the notice, the Owners continue to be entitled to receive housing assistance payments during the corrective action period and until HUD notifies them in writing that they have failed to take the necessary corrective action and that housing assistance payments will be abated."  *Id.* at 676.  The court found that during the corrective action period, claims for housing assistance payments were not false claims because they were claims for money to which the Owners were entitled.  *Id.*

In *Willard*, the defendant had entered into contracts with the Health Care Financing Administration ("HCFA") of the United States Department of Health and Human Services to provide health care services to Medicare beneficiaries.  *Willard*, 336 F.3d at 378.  The defendant was paid a fixed rate for each enrollee, determined annually, based on the average anticipated Medicare expenses of all Medicare-eligible individuals in a given geographic area.  *Id.*  The plaintiff argued that the defendant engaged in a "cherrypicking scheme," violating the FCA in three ways.  *Id.* at 380.  He first contended that "because [the defendant was] paid based on the average expenses for all Medicare-eligible individuals, covering both healthy and sick beneficiaries, [the defendant] effectively overcharged the Government for Medicare services by 'cherrypicking' which beneficiaries it would target for enrollment."  *Id.*  Next, the plaintiff claimed that "by seeking payment under the Medicare program, [the defendant] falsely represented (impliedly certified) compliance with all material terms, statutes, and regulations (namely anti-discriminatory regulations) central to the Medicare HMO program."  *Id.*  Finally, the plaintiff argued that the defendant procured its contract with the HCFA by fraud in the inducement.  *Id.*

The Fifth Circuit noted that it had not specifically addressed whether FCA liability can be based on an "implied certification" theory.  *Id.* at 381.  However, it noted that it did not need to determine whether it would recognize such a theory, because even under that theory, the plaintiff would still lack a cognizable claim for two reasons.  *Id.* at 382.  Primarily, the court noted that the plaintiff had failed to allege facts that would show that the government "conditioned its payment" to the defendant on any implied certification of compliance with the anti-discriminatory regulations at issue.  *Id.*  The court noted that if the defendant engaged in any

that "[e]ven if the plaintiff ha[d] sufficiently pleaded that the defendant engaged in conduct that breached the lease in question, that breach d[id] not of itself constitute a viable FCA claim."  *Id.* at *12.

This case is very similar to *Coppock*.  In his First Amended Complaint, Marcy has alleged that "the right to extract and sell the oil reserves of the United States is conditioned on strict compliance with all orders and regulations intended to protect the marine environment, the terms of the [l]ease, and the Outer Continental Shelf Lands Act."  (Pla. First Amended Comp., ¶ 27).  However, Marcy does not allege that "compliance with [the lease] terms [requiring compliance with environmental statutes and regulations] was a true prerequisite" to Defendants' continued use of the leased property.  *Coppock*, 2003 WL 21730668, at *12.  Nor does he "allege that failure to certify statutory or contractual compliance would *necessarily* have resulted in termination of the lease[ ]."  *Id.*

Rather, Marcy alleges that "Section 23 of the [l]ease and the OCSLA, 43 U.S.C. § 1334, *allow* the Secretary to cancel a mineral lease at any time for violations of the lease terms of the OCSLA.  'Serious' harm or damage to the 'marine environment' is specifically listed in the OCSLA as grounds for termination of the [l]ease at 43 U.S.C. § 1334(a)(1)."  (Pla. First

---

practice that "'would reasonably be expected to have the effect of denying or discouraging enrollment' based on health status, the Government [was] merely authorized to suspend future enrollment, suspend *future* payments, or impose monetary penalties, rather than withhold payment for those already enrolled."  *Id.* (citing 42 U.S.C. § 1395mm(i)(6)).  The court further noted that the plaintiff did not allege that the regulations concerning discrimination based on health status and income were referenced in the contract, let alone their compliance certified as a condition of payment.  *Id.* at 383.  The court affirmed the district court's judgment dismissing the action.  *Id.* at 388.

Amended Comp., ¶ 31) (emphasis added).  According to Marcy's allegations, termination of the

lease upon violations of its terms is discretionary.  Thus, the Court finds that because Marcy has

failed to allege facts that would show that the Government "conditioned its payment [or

continuance of the lease]" on Defendants' certification of compliance with statutes or

regulations, his claim under Section 3729(a)(2) must be dismissed.  *See Willard*, 336 F.3d at 382.

2. Count II - "Reverse False Claim" under Section 3729(a)(7)

Section 3729(a)(7) is the "reverse False Claims Act subsection."  *United States ex rel.*

*Bain v. Georgia Gulf Corp.*, 386 F.3d 648, 652 (5th Cir. 2004).  Under this subsection, a plaintiff

may recover against "any person who . . . knowingly makes, uses, or causes to be made or used,

a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money

or property to the Government."  31 U.S.C. § 3729(a)(7) (2002).  "In a reverse false claims suit,

the defendant's action does not result in improper payment by the government to the defendant,

but instead results in no payment to the government when a payment is obligated."  *Bain*, 386

F.3d at 653.

Marcy bases his Section 3729(a)(7) complaint on allegations that Defendants have

intentionally and knowingly failed to report any and all of the nighttime discharges of oil and

other hazardous substances into the waters of the Gulf of Mexico as required by the FWCPA and

APPS, and the National Pollutant Discharge Elimination System General Permit in order to

"conceal, avoid, or decrease" their obligation to pay oil royalties, transfer oil resources, and pay

civil fines owed the United States for violations of the FWCPA, APPS, and the OCSLA and to

avoid their obligation to remediate the discharges and pay for damages to the natural resources

of the United States under the OPA. (Pla. First Amended Complaint, ¶ 55). Marcy further

contends that defendants have intentionally neglected to record the discharges in the Oil Log

Book and weekly drilling reports in order to conceal their violations during regulatory

inspections conducted by the United States Coast Guard. (*Id.*). Marcy contends that

Defendants' unlawful conduct is continuing in nature and this threatens to deprive the United

States of its legal entitlement to oil, oil royalties, and civil penalties and fines owed to it. (*Id.*, ¶

62).

Defendants primarily rely on *Bain*, *supra* in support of their argument that Plaintiff has

failed to state a claim under Section 3729(a)(7). The relator/plaintiff in *Bain* had been employed

by the defendant, who operated a chemical facility that manufactured polyvinyl chloride

("PVC"), a known carcinogen. *Id.* at 650. The plaintiff alleged that the laws of the United

States and Louisiana, including the rules and regulations of and permits issued by the

Environmental Protection Agency ("EPA") and the Louisiana Department of Environmental

Quality ("LDEQ") required the defendant to monitor and report emissions of vinyl chloride that

occurred during the production of the PVC. *Id.* He further contended it was the defendant's

standard operating procedure to vent vinyl chloride into the atmosphere without monitoring or

measuring the releases and then to make false records which they routinely and knowingly

submitted to the LDEQ and EPA. *Id.* at 651. He claimed that the defendant had violated Section

3729(a)(7) because its actions had deprived the United States and Louisiana of fines, and other

monetary assessments which would have been made had the actions of the defendant not been

concealed. *Id.* The district court found that the plaintiff had failed to state a cause of action

under the reverse False Claims Act.  *Id.* at 653.

On appeal, the plaintiff argued that the defendant's obligations under the reverse FCA were based on its environmental permits, which incorporated provisions of the Clean Air Act ("CAA"), 42 U.S.C. § 7401, *et seq.*  The CAA requires the EPA to establish regulations for air quality standards and each state to develop an implementation plan that describes the manner in which the state will achieve the national minimum standards on air pollution.  *Bain*, 386 F.3d at 653 (citing the Clean Air Act, 42 U.S.C. § 7401, *et seq.*)).  The LDEQ's role is to ensure Louisiana's compliance with environmental regulations, including the air quality mandates.  *Id.*  The LDEQ issues permits imposing limits on the amount of air pollution a source can emit.  *Id.*  Under the CAA, the federal government is charged with enforcement of the states' implementation plans and air quality permits, which have the effect of federal law.  *Id.* (citing the Clean Air Act, 42 U.S.C. § 7413).  The LDEQ permits are enforced by the State of Louisiana.  *Id.*  The plaintiff argued that a potential fine or monetary penalty, such as those to which the defendant could be subject for causing emissions precluded by the CAA or the state implementation plan and in circumstances or quantities not authorized by its permit constituted an "obligation" to the government under Section 3729(a)(7) of the FCA.[5]

The defendant argued that potential fines or penalties could not be the basis of an FCA

---

[5]  The court noted that "[n]either the complaint nor the amended complaint allege[d], and Bain [did] not contend, that at any time *at or after* the making of the [alleged] false statements any fine or penalty, with respect to the emissions allegedly misrepresented by such statements, had ever been imposed on [the defendant] or that any proceeding seeking to impose, or to determine whether to impose, any such fine or penalty was ever pending or instituted."  *Id.* at 654.

reverse claim.  *Id.* at 654.  Citing *United States, ex rel. American Textile Mfrs. Inst., Inc. v. The Limited, Inc.*, 190 F.3d 729, 736 (6th Cir. 1999) and *United States v. Q International Courier, Inc.*, 131 F.3d 770, 774 (8th Cir. 1997) ("*Quick*"), it contended that for such a claim to exist, it must have made a false record at the time that it owed an obligation to the government sufficiently certain to give rise to an action of debt at common law.  *Id.*

> The Fifth Circuit held as follows:

> [T]he reverse false claims act does *not* extend to the potential or contingent obligations to pay the government fines or penalties which have not been levied or assessed (and as to which no formal proceedings to do so have been instituted) and which do not arise out of an economic relationship between the government and the defendant (such as a lease or a contract or the like) under which the government provides some benefit to the defendant wholly or partially *in exchange* for an agreed or expected payment or transfer of property by (or on behalf of) the defendant to (or for the economic benefit of) the government.

*Id.* at 657.  The court found that "the mere contingent potential" that statutory fines and penalties "might be (but had not been) sought and imposed" for violations of the CAA or governmental regulations "does not constitute 'an obligation to pay or transmit money or property to the Government' within the meaning of [S]ection 3729(a)(7)."  *Id.* at 658.

Marcy distinguishes *Bain* from the instant case in two ways.  First, he points out that the Fifth Circuit found that the air discharge permits the defendants were alleged to have violated did not constitute a contract with the government.  Marcy is correct in this assertion.  The Fifth Circuit did state that "[n]othing in the complaint or amended complaint even suggests that [the defendant] had any sort of contractual or other economic relationship with the government, or indeed any relationship at all other than having a permit authorizing certain PVC emissions."

27

*Bain*, 386 F.3d at 657.  It further stated that "[a]ny such relationship was obviously purely regulatory, and not one in which any economic or financial transfer or payment by [the defendant] to the government was contemplated.  The permit obviously contemplated that [the defendant] would not make otherwise precluded PVC emissions in amounts or circumstances other than as authorized by the permit, not that [the defendant] would pay the government for PVC emissions."  *Id.*

Further, the Court notes that the *Bain* court distinguished *Bain* from another appellate case, *United States v. Pemco Aeroplex, Inc.*, 195 F.3d 1234, 1237 (11th Cir. 1999) on the grounds that there was a Government contract in *Pemco*.  The *Bain* court explained that "in that case, the court found that a reverse false claim existed when the defendant had an existing agreement with the government, in the form of an actual contract, that created 'a specific legal obligation at that time to dispose of any excess property in accordance with the government's instructions.'"  *Id.* at 656 (quoting *Pemco*, 195 F.3d at 1237)).  The *Bain* court further found that "[t]he [*Pemco*] court distinguished *Quick* (cited by the defendant in *Pemco*) because [*Quick*] did not involve a government contract and held that a potential obligation satisfied the requirements of section 3729(a)(7)."  *Id.*

While the *Pemco* case did involve a Government contract, as does the instant case, the contract was of a different nature.  Moreover, this Court notes that the *Pemco* court did not actually hold that "a potential obligation satisfied the requirements of 3729(a)(7)," as the *Bain* court states.  In fact, the *Pemco* court specifically stated, "The government would ask us to hold that a potential obligation would satisfy the requirements of § 3729 (a)(7), but we do not reach

28

that issue because the obligation here is so clearly an existing obligation." *Pemco*, 195 F.3d at 1237, n. 2.

In *Pemco*, the defendant allegedly contracted with the United States Air Force to perform maintenance on some of its aircrafts. *Id.* at 1235. As a result of its contracts, it had on its premises both older and newer aircraft wings belonging to the Government. *Id.* It allegedly possessed five wings that were not needed to perform its contracts. *Id.* The defendant thus allegedly initiated the "Plant Clearance" procedure to have the Government instruct it regarding the return of the wings to the Air Force or other disposal. *Id.* As part of this procedure, the defendant allegedly submitted to the United States a document listing and describing the wings. *Id.* However, according to the complaint, the national stock numbers used by the defendant incorrectly referenced older, obsolete model wings that the government routinely disposed of as scrap. *Id.* The plaintiff asserted that in the above described document, the defendant offered to purchase the five wings for a total price of $1,875, the scrap value corresponding to the national stock numbers for older, obsolete model wings. *Id.* The plaintiff further asserted that the defendant knew that the stock numbers it used were incorrect, and the wings it possessed were worth substantially more. *Id.* According to the plaintiff, as a result of the defendant's use of the incorrect stock numbers, the government agreed to sell the five wings to the defendant for $1,875. *Id.* at 1235-36. The plaintiff further alleged that the defendant thereafter sold only two of the wings for approximately $1,500,000. *Id.* at 1236.

The *Pemco* court found that the complaint's allegations made clear that the defendant had an *existing*, legal "obligation to pay or transmit money or property to the Government" for

29

purposes of Section 3729(a)(7).  *Id.* at 1327.  It explained that the complaint contained express references to the defendant having an obligation under its contracts to account for the full value of the five wings in its possession.  *Id.*  The court noted that the contracts allegedly required the defendant, upon determining that it possessed excess government property, to submit an inventory schedule identifying the excess property in accordance with the government's instructions.  *Id.*  It further noted that the complaint also explained that, rather than selling excess property to a contractor such as the defendant, the government could require its contractors either to return the excess property or to make some other disposition of it.  *Id.*  Thus, the court found that the defendant "also had an *existing* contractual obligation to either return (i.e., "transmit" under [Section] 3729(a)(7)) or to purchase (i.e., "pay" for under [Section] 3729(a)(7)) the excess government property it possessed."  *Id.* (emphasis added).  The court found that the obligation was not a potential or contingent obligation because "at the time [the defendant] submitted its inventory schedule to the government, the wings were deemed excess, and . . . thus [the defendant] had a specific legal obligation at that time to dispose of any excess property in accordance with the government's instructions.."  *Id.*

Here, the complaints allege that the Defendants had a contractual obligation to comply with certain statutes, regulations, and permits and that in failing to report their violations of these statutes, regulations, and permits, they were seeking to avoid payment of fines, clean up costs, etc., associated with those statutes, regulations, and permits.  While there is a governmental contract in the instant case, this case is distinguishable from *Pemco* because the alleged obligation to pay fines and/or penalities is a potential or contingent one, not an existing one.

Marcy has not alleged that the Government has sought or imposed fines or penalties as a result of Defendants' alleged violations.  As stated by the *Bain* court, "the mere contingent potential that . . . fines or penalties might be (but [have] not been) sought and imposed does not constitute 'an obligation to pay or transmit money or property to the Government' within the meaning of Section 3729(a)(7)."  *Bain*, 386 F.3d at 658.  *See also United States, ex rel. Steven G. Coppock v. Northrup Grumman Corporation*, 2003 WL 21730668, at *13-14 (N.D. Tex. 2003) (finding the plaintiff's allegations that the defendant's failure to disclose chemical leaks to the Navy (from whom the defendant leased a Naval Weapons Industrial Reserve Plant) and the EPA allowed the defendant to avoid payment for clean-up were insufficient to state a claim under § 3729(a)(7) because this "potential liability" did not constitute an "obligation" under that section).

Next, Marcy attempts to distinguish *Bain* on the ground that the CAA, the statute at issue in that case, contained no self-reporting requirement, whereas the CWA imposes an obligation upon polluters to report their violations and provides that violators of the reporting obligation are subject to fines and civil penalties.  (Pla. Memo., p. 17, 19).  He argues that the language of the statute makes clear that this obligation arose at the time of the unlawful discharges.  (*Id.*, p. 17). He contends that the APPS has a similar provision.  (*Id.*, p. 18).  Marcy cites two district court cases, *Pickens v. Kanawha River Towing*, 916 F. Supp. 702 (S.D. Ohio 1996) and *United States ex rel. Stevens v. McGinnis, Inc.*, 1994 WL 799421 (S.D. Ohio 1994), for the proposition that failure to self-report violations of the CWA and omitting discharges from vessel logs to avoid CWA fines and penalties violates Section 3729(a)(7).  Marcy's argument lacks merit.  The Sixth Circuit declined to follow these cases in *American Textile Manufacturers Institute, Inc. v. The*

31

*Limited, Inc.*, 190 F.3d 729, 735 (6th Cir. 1999).  Thus, Marcy's allegations regarding avoidance

of fines, penalties, etc. are insufficient to state a claim under the reverse false claims subsection,

3729(a)(7).

The amended complaint also attempts to assert another "obligation" under Section

3729(a)(7).  Marcy alleges that Defendants failed to report discharges not only to avoid fines and

penalties, but also to "conceal, avoid, or decrease" their obligation to pay oil royalties and

transfer oil resources.  (First Amended Complaint, ¶ 55).  Notably, this allegation is not present

in the original complaint.  Defendants have not addressed this allegation in their memorandum.

Marcy briefly addresses it in his opposition memorandum.  In his opposition, he contends:

> [T]he OCLSA at 43 U.S.C.A. § 1337 *allows* the Secretary of Interior to "reduce or
> eliminate" any royalty owed the United States for the benefit of the lessee.  The
> Plaintiff alleges that relief from the Defendants' obligation to pay is conditioned
> upon continued compliance with the terms of the Lease, which of course includes the
> requirement to abide by all applicable environmental regulations.  By violating the
> terms of the Lease and thereby continuing to pump oil from the Outer Continental
> Shelf when in breach of the Lease, the Defendants are obligated to transfer any oil
> and gas taken from the United States without the authority to do so and to pay any
> oil and gas royalty owed the United States and by falsifying the Midland's Oil Log
> Book and MMS 133 forms, the Defendants submitted false records for the purpose
> of avoiding those obligations to transfer property and/or pay oil and gas royalties in
> violation of § 3729(a)(7) of the FCA.

(Pla. Opp., p. 22) (emphasis added).  It is clear that the obligation to pay royalties is an

"obligation to pay or transmit money or property to the Government" under Section 3729(a)(7).

(*See*, *e.g.*, *Kennard v. Comstock Resources, Inc.*, 363 F.3d 1039, 1048 (10th Cir. 2004).

However, more is required to state a claim under section 3729(a)(7).  Plaintiff must also allege

that Defendants knowingly made, used, or caused to be made or used, a false record or statement

to conceal, avoid or decrease that obligation to state a claim under 3729(a)(7).  Further, courts

have held that a claim under (a)(7) requires proof that the United States suffered damages as a

result.  *See, e.g.*, *Wilkins ex re. United States v. State of Ohio*, 885 F. Supp. 1055, 1059 (S.D. Oh.

1/31/95).  Here, Marcy claims that the OCSLA *allows* the Secretary to reduce or eliminate

royalties owed by lessees.  He does not claim that the United States actually did so or that

Defendants failed to pay the full amount of royalties owed.  This case is distinguishable from

other cases like *Kennard*, in which the defendant allegedly submitted false information regarding

the amount of royalties due.  *Kennard*, 363 F.3d at 1048.

Finally, Marcy's allegation that "[b]y violating the terms of the Lease and thereby

continuing to pump oil from the Outer Continental Shelf when in breach of the Lease, the

Defendants are obligated to transfer any oil and gas taken from the United States without the

authority to do so . . ." is not sufficient to state a claim under Section 3729(a)(7) either.  (Pla.

First Amended Comp., ¶ 55).  Marcy has not alleged that violation of the terms of the lease

automatically terminates the lease.  Thus, the obligation to transfer any oil and gas to the United

States would be a *contingent* obligation, which is insufficient to state a claim under Section

3729(a)(7).

The Court notes that the Sixth Circuit in *American Textile Manufacturers Institute, Inc.*,

190 F.3d 729, 741 (6th Cir. 1999) concluded that Section 3729(a)(7)'s "definition of 'obligation'

certainly includes those arising from acknowledgments of indebtedness, final judgments, and

*breaches of government contracts*."  (emphasis added).  The court did not provide a detailed

explanation about when such a breach could constitute an "obligation" under (a)(7).  Earlier in

the opinion, however, it did cite the case of *United States ex rel. S. Prawer & Co. v. Verrill & Dana*, 946 F. Supp. 87, 95, 94 n. 12 (D. Me. 1996) with seeming approval, which offers some clarification.  It noted that the *Prawer* court defined "obligation" narrowly, "as arising only from '*a specific contract remedy*, a judgment, or an acknowledgment of indebtedness.'"  *Id.* at 735. (emphasis added).  Moreover, the Sixth Circuit determined that a reverse action requires "proof that the defendant made a false record or statement at a time that the defendant owed to the government an obligation sufficiently certain to give rise to an action of debt at common law." *Id.* at 736.  Marcy has not alleged that the lease provided a specific contract remedy making Defendants immediately liable to pay or transmit money or property to the government upon violation of the lease terms and thus creating an obligation sufficiently certain to give rise to an action of debt at common law.  Therefore, Marcy's 3729(a)(7) claim cannot survive and must be dismissed.

Because Marcy has failed to state a claim under Section 3729(a)(2) and (7), the Court need not address Defendants' contention that Marcy has failed to plead fraud with the particularity required by Fed. R. Civ. P. 9(b).  Even allowing Marcy to amend the complaint to plead fraud with more particularity would not cure his failure to state a claim.

**ACCORDINGLY**,

**IT IS ORDERED** that the Motions to Dismiss, filed by Defendant Remington Oil and Gas Corporation (Rec. Doc. 9), Defendant Rowan Companies, Inc. (Rec. Doc. 12), and Defendants Newfield Exploration Gulf Coast, Inc. and Newfield Exploration Company (Rec. Doc. 14) are **GRANTED**.  The complaint(s) is dismissed, as Plaintiff/Relator has failed to state a

34

claim under the False Claims Act.  Further, the Court notes that the United States requested in its

Notice of Election to Decline Intervention that the Court solicit the written consent of the United

States before ruling or granting its approval of a proposal by the relator or the defendants that the

action be dismissed, settled, or otherwise discontinued.  The United States cited 31 U.S.C. §

3730(b)(1) in support of this request.  That section provides that an FCA action brought by a *qui*

*tam* relator "may be dismissed only if the court and the Attorney General give written consent to

the dismissal and their reasons for consenting."  *Id.*  However, courts have held that this

provision requires the Attorney General's consent only where the *relator* seeks dismissal, not

where, as here, the district court grants a motion by the defendant to dismiss for failure to state a

claim.  *United States ex rel. Shaver v. Lucas Western Corporation*, 237 F.3d 932, 934 (8th Cir.

2001).  Thus, the Attorney General's consent is not required for the Court to dismiss this action.


New Orleans, Louisiana, this 16th day of August, 2006.


_____

JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE